UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREEN SHIELD HOME, LLC,

Plaintiff,

v.

CONSTRUCTION MANAGEMENT CORPORATION,

Defendant.

______________________________/

Case No. 1:25-cv-946

Hon. Hala Y. Jarbou

CONSTRUCTION MANAGEMENT CORPORATION,

Plaintiff,

v.

JASON LOCKE, et al.,

Defendants.

______________________________/

Case No. 1:25-cv-854

Hon. Hala Y. Jarbou

**OPINION**

Before the Court is a motion for partial summary judgment filed in two consolidated cases. The lead case, *Green Shield Home, LLC v. Construction Management Corp*., No. 1:25-cv-946 (W.D. Mich. Aug. 15, 2025), is brought by Green Shield Home, LLC ("GSH"), against Construction Management Corporation ("CMC"). GSH seeks a declaratory judgment that it has not infringed CMC's trademarks, as well as related injunctive relief. In the member case, *Construction Management Corp. v. Locke*, No. 1:25-cv-854 (W.D. Mich. July 29, 2025), CMC brings trademark infringement claims against four members or employees of GSH: Adam Rought, the CEO and a member of the LLC; Jason Lyons, a corporate manager and member; Brandie

Locke, a member; and her spouse Jason Locke, a GSH employee. GSH and the individual defendants have jointly filed the present motion (ECF No. 47), which requests summary judgment on GSH's claim for declaratory relief, CMC's claims against the individual defendants, and CMC's counterclaims against GSH.

For the reasons explained below, the Court will grant in part and deny in part the motion for summary judgment. In particular, the Court will grant summary judgment to GSH on its claim seeking a declaration that CMC lacks trademark rights to the marks in dispute outside the Traverse City area. The Court will also grant summary judgment to the individual defendants (Jason Locke, Brandie Locke, Rought, and Lyons) and dismiss all claims against them. The Court will deny summary judgment on the remainder of GSH's requests for declaratory judgment and CMC's counterclaims against GSH. GSH's request for injunctive relief, on which it does not move for summary judgment, also remains in the case.

## I. BACKGROUND

CMC is a home construction and repair company headquartered in Traverse City, Michigan. (1/14/2026 Johnston Dep. 6, ECF No. 56-65.) CMC was founded in 2009, and has done business under the name Green Shield since 2010. (*Id.* at 8; Certificate of Assumed Name, ECF No. 56-1.) Between 2010 and 2025, CMC completed about 45 construction projects, almost all of which occurred within a 50-mile radius of Traverse City. (*See* Resp. to Interrogs. 2–5, ECF No. 48-11 (listing CMC projects and locations); Br. in Supp. 8–10, ECF No. 48 (chart of CMC projects and distance from Traverse City).) CMC has used the Green Shield name in communications with customers, on company documents, in branding and marketing, and on its website. (1/14/2026 Johnston Dep. 9, 11–12, 24; Roofing Estimate, ECF No. 56-2; Heating Estimate, ECF No. 56-3; Painting Estimate, ECF No. 56-6; Website Screenshot, ECF No. 56-7.)

In 2018, CMC commissioned the following logos, which it uses on its website, business cards, and documents:

(1/14/2026 Johnston Dep. 9; Walker Dep. 13, ECF No. 48-16; Opp'n Br. 5, ECF No. 56.) The logo also appears on company vehicles, yard signs, and clothing. (1/14/2026 Johnston Dep. 55–56, 58–59.)

GSH was founded in 2018 under the name Aegis Home Safety and Retirement Securities, LLC. (Certificate of Amendment, ECF No. 48-3.) It is a deck construction company that operates in Michigan, Indiana, and Ohio. (Tepper Decl. ¶¶ 18, 45, ECF No. 48-4.) Its name was changed to Green Shield Home, LLC, on December 30, 2019. (*Id.*) All of the individual defendants stated in declarations that the name Green Shield was chosen without knowledge of CMC's use of the name. (Rought Decl. ¶¶ 5–6, ECF No. 48-19; B. Locke Decl. ¶ 11, ECF No. 48-20; J. Locke Decl. ¶ 12, ECF No. 48-21; Lyons Decl. ¶ 11, ECF No. 48-22.) In 2022, GSH began using the following logos:

(Br. in Supp. 5-6, ECF No. 48; Rought Decl. ¶ 4; B. Locke Decl. ¶¶ 5–6.) The individual defendants asserted in declarations that they were unaware of CMC's logos when GSH's logos were developed, and that GSH's logos were created independently by design firms. (Rought Decl. ¶¶ 31–32; B. Locke Decl. ¶¶ 9–11; J. Locke Decl. ¶¶ 10–12; Lyons Decl. ¶¶ 9–11.) GSH has used the Green Shield name and logo in extensive advertising campaigns, as well as on business cards. its website, company vehicles, and employee uniforms. (Tepper Decl. ¶¶ 21–39, 42.) GSH filed for federal registration of the trademark GREEN SHIELD HOME IMPROVEMENT on February 22, 2022, and the mark was registered on October 24, 2023. (*Id.* ¶ 11.) GSH filed for federal registration of the two logos pictured above on October 31, 2022, and both marks were registered on July 9, 2024.[1] (*Id.* ¶¶ 13, 16.)

On March 1, 2023, Timothy Johnston, the owner of CMC, sent an email to GSH claiming that he had the exclusive right to use the Green Shield name. (*See* J. Locke Dep. 132–34, ECF No. 56-63.) GSH executives apparently concluded that they would not face legal liability if they refrained from taking work in the Traverse City area. (*See* J. Locke Dep. 134.) Jason Locke testified that GSH did not perform any work in Traverse City after being contacted by Johnston, although Locke indicated that GSH had accidentally sent a batch of marketing flyers to the Traverse City area. (*See* J. Locke Dep. 127, 134.) Nathan Fortier, the Director of Finance at GSH, testified that GSH had sent flyers to Traverse City in 2024 and again in late 2024 or early 2025. (*See* Fortier Dep. 128–130, ECF No. 56-64.) Fortier also testified that GSH is currently performing work in the Traverse City area, and in total has done around "fifty to a hundred" jobs in that region. (*Id.* at 132, 134.) Rought testified that as of July of 2024, GSH was "most likely"

[1] GSH also registered a similar logo on October 24, 2023, that was a precursor to its current logos pictured above. (*See* Rought Decl. ¶¶ 4, 15.)

working on jobs or bidding on contracts in the Traverse City area. (Rought Dep. 123.) A list submitted by GSH of its completed jobs contains several in the Traverse City area, including jobs in Lake City and Frankfort in 2024 and jobs in Interlochen and Traverse City in 2025. (GSH Jobs List, ECF No. 48-1, PageID.467, 473–74.)

On July 2, 2024, Johnston received a message through his website's contact form that purported to be from Jason Locke.[2] (7/2/2024 Message, ECF No. 56-37.) The message stated, "Green shield deck builders is not only marketing in your area but also currently building projects. They do not care about any warnings of lawsuits you have expressed." (*Id.*) Jason Locke denied having sent the message. (J. Locke Dep. 126–27.) Johnston subsequently sent the contact form message to Jason Locke, who forwarded it to Rought. (Rought Dep. 113–14, 124–25.)

The lead action in this case, docketed at 1:25-cv-946, was filed by GSH against CMC in the Eastern District of Michigan on April 25, 2025. CMC brought counterclaims against GSH and filed a third-party complaint against the individual defendants. On July 29, 2025, CMC filed an action against the individual defendants, docketed at 1:25-cv-854, in this Court. The lead action was transferred to this Court on August 15, 2025, and the cases were subsequently consolidated. CMC later filed an amended answer dropping its third-party claims, which were duplicative of its claims in the second action. Accordingly, though the parties refer to the individual defendants as the third-party defendants, the Court avoids that terminology to prevent confusion.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

[2] The message was sent under the name "Jason Juberg," Jason Locke's prior name. He now uses the last name of his spouse, Defendant Brandie Locke. (*See* Foster Dep. 21, ECF No. 56-64; J. Locke Dep. 120.)

56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Trs. of Iron Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (alteration in original) (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020)). "Where the moving party has the burden of proof" at trial, they must point to evidence establishing "that no reasonable trier of fact could find other than for the moving party." *Id.* at 488–49 (cleaned up) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). When the moving party does not bear the burden of proof at trial, they may meet their initial burden at summary judgment by "submitting affirmative evidence that negates an essential element of the nonmoving party's claim," *Kava v. Peters*, 450 F. App'x 470, 473 (6th Cir. 2011) (cleaned up), or by "pointing out the lack of evidence to support an essential element" of that claim, *Rockwood Auto Parts, Inc. v. Monroe County*, 155 F.4th 557, 566 (6th Cir. 2025) (cleaned up). Once the movant has met their initial burden, the nonmovant can avoid summary judgment by presenting "sufficient evidence from which a jury could reasonably find in [their] favor." *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (cleaned up).

## III. ANALYSIS

The core of this dispute concerns which party has the right to use the trademarks in question—the Green Shield name and logo. GSH and the individual defendants do not dispute that GSH's name and logo are similar enough to CMC's to potentially constitute infringement. Instead, the movants argue that (1) CMC has abandoned the marks, (2) CMC lacks ownership of the marks outside the Traverse City area, and (3) the individual defendants are not personally liable for any infringing acts of GSH. As explained below, the Court holds that (1) CMC has not abandoned its marks, (2) CMC possesses common law rights to the marks only in the Traverse City area, and (3) no individual defendants may be held personally liable. Therefore, the Court will grant in part and deny in part the motion for summary judgment.

### A. Abandonment of Marks

GSH first argues that it is not liable for infringement of the disputed marks—i.e, the Green Shield name and the green "G" logo—because CMC has no right to those marks. CMC was the first to use the marks: it began using the Green Shield name in 2010, while GSH did not begin using it until 2019 at the earliest, and CMC began using its logo in 2018, while GSH did not use its logo until 2022. However, CMC never registered its marks, whereas GSH obtained federal registration of the Green Shield name and logo in 2023 and 2024, respectively. Even "[w]ithout federal registration, a valid trademark may still be used in commerce." *Matal v. Tam*, 582 U.S. 218, 225 (2017). An unregistered trademark is "enforceable under § 43(a) of the Lanham Act," as well as under state law. *Id.* at 225–26. Although the complaint does not clarify, the Court takes GSH to be seeking a declaratory judgment of non-infringement under both federal and state law; CMC similarly asserts its claims and counterclaims based on both federal and state law.[3]

[3] A federal cause of action for infringement of an unregistered mark relies on federal substantive law, *see* 4 McCarthy on Trademarks and Unfair Competition § 27:18 (5th ed. 2026), whereas a state cause of action for infringement relies

As a matter of federal "common law, ownership of trademark or service mark rights is obtained by actual use." *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 571 (6th Cir. 2001). "The first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common law rights to the mark in the geographic area in which the mark is used." *Id.* Similarly, under Michigan law, "[t]he right to a trademark grows out of its use, and covers the area in which it is used." *Interstate Brands Corp. v. Way Baking Co.*, 270 N.W.2d 103, 105 (Mich. 1978). GSH does not dispute that CMC originally acquired common law rights to its marks through use. However, GSH argues that CMC abandoned those marks between November of 2019 and May of 2023, so when GSH began using similar marks in October of 2022, it became the senior user.

"To prove abandonment, a party must demonstrate both non-use and intent not to resume use." *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 848 (6th Cir. 2013); *see Interstate Brands*, 270 N.W.2d at 105 ("Abandonment is the concurrence of an intention to abandon and an act or omission by which such intention is carried into effect."). GSH argues that CMC has provided no evidence it used the marks in question between November of 2019 and May of 2023. "Nonuse for three consecutive years is prima facie evidence of abandonment, and creates a rebuttable presumption that the trademark owner has abandoned the mark without intent to resume use." *Impulsaria, LLC v. United Distrib. Grp.*, No. 1:11-cv-1220, 2012 WL 5178147, at *6 (W.D. Mich. Oct. 18, 2012) (citing *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1087 (Fed. Cir. 2000)); *see also* 15 U.S.C. § 1127.

---

on state substantive law, *see Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 & n.1 (6th Cir. 1991). In practice, there is significant overlap between the two bodies of law. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 521 (6th Cir. 2007).

However, contrary to GSH's assertions, there is at least a dispute of fact as to whether CMC used the marks between 2019 and 2023. Johnston testified that CMC used the marks on at least twelve projects between 2020 and 2022. (*See* 1/14/2026 Johnston Dep. 61–62; List of Construction Projects, ECF No. 56-31, PageID.1877.) GSH contends that "CMC produced no invoices, proposals, contracts, or any customer-facing document bearing its marks" from 2019 to 2023. (Br. in Supp. 2.) But CMC has no obligation to produce the specific form of evidence GSH demands; Johnston's testimony that he used the marks in connection with the projects in question satisfies CMC's burden at summary judgment. There is also evidence that CMC's website contained the marks during the time period in question, which further supports CMC's claim of continuing use.[4]

Thus, GSH has not established that CMC abandoned its marks.

**B. Geographic Scope**

The evidence suggests that CMC has continually used its marks from 2010 to the present—including at the time when GSH registered its marks. "Federal registration of a trademark or service mark cannot create rights and priority over others who have previously used the mark in commerce . . . ." *Allard*, 249 F.3d at 572. Accordingly, "[t]he territorial rights of a holder of a federally registered trademark are always subject to any superior common law rights acquired by another party through actual use prior to the registrant's" registration of the marks. *Id.* "The first to use a mark in the sale of goods or services is the 'senior user' of the mark and gains common

[4] GSH provided screenshots from the Wayback Machine that purport to show CMC's website during this time period without the logo in question, but CMC's website designer testified that the Wayback Machine did not capture the image properly. (Walker Dep. 28.) GSH counters that the best evidence rule precludes CMC from relying on testimony about the website, *see* Fed. R. Evid. 1002, but the best evidence rule only applies where an "original" exists, and there is no existing original website. *Cf Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 989 (N.D. Cal. 2017) ("It is difficult, if not impossible, to conceive of how an 'original' screenshot would be presented."). Moreover, even if the logo was not on the website, GSH does not dispute that the Green Shield name still appeared there.

law rights to the mark [only] in the geographic area in which the mark is used." *Id.* Even if CMC is the senior user of the marks as to the area in which it does business, a junior user like GSH may still have acquired rights to use the marks "in a geographically remote location, defined as an area in which the senior user's mark was not known [by consumers] such that there would be confusion as to source."[5] *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 245 (E.D.N.Y. 2009); *ACCU Pers., Inc. v. AccuStaff, Inc.*, 846 F. Supp. 1191, 1205 (D. Del. 1994) ("Trademarks operate in geographically remote markets when neither one has penetrated the market of the other."). If a junior user registers the marks in those circumstances, "the extent of the senior user/non-registrant's territory is frozen as of the date of actual registration to the junior user." *Allard*, 249 F.3d at 572. So when GSH registered the marks, CMC retained the right to use them only in the geographic area where it had already established its own common law rights.

The parties disagree as to the geographic area over which CMC established common law rights to the marks. "The touchstone of the determination of a trade area is likelihood of confusion. A trade area is the area in which people have associated a service mark with a particular business such that they would likely be confused by someone else's unauthorized use of the mark." *All Video, Inc. v. Hollywood Ent. Corp.*, 929 F. Supp. 262, 266 (E.D. Mich. 1996); *see also* 4 McCarthy on Trademarks and Unfair Competition § 26:27 (5th ed. 2026) ("Since the goal of trademark litigation is the elimination of a likelihood of customer confusion, the territorial scope of trademark rights within the United States must be defined in terms of customer

---

[5] A junior user must also adopt the senior user's marks in "good faith," which most courts take to mean without knowledge of the senior user's use of the marks. *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 436–39 (9th Cir. 2017), *abrogated in part on other grounds by Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212 (2020). GSH has provided evidence that it created its own marks without knowledge of CMC's name or logo (*see* Rought Decl. ¶¶ 5–6; B. Locke Decl. ¶ 11; J. Locke Decl. ¶ 12; Lyons Decl. ¶ 11), and CMC has not presented any evidence to the contrary.

perception . . . ."). To determine whether a business has market presence in a particular area, the Court considers "(1) the volume of sales of the product in that area, (2) growth trends in the area, (3) the market penetration as a function of the total product market, and (4) the amount of advertising." *Allard*, 249 F.3d at 574. GSH asserts that CMC's geographic territory extends at most 50 miles outside of Traverse City. Almost all of CMC's business has occurred in that area, and there is no evidence that CMC advertises outside of it. CMC makes several arguments as to why its business is not confined to Traverse City, but all are unavailing.

First, CMC contends that it has completed a few projects outside of Traverse City: a 2010 project in North Carolina, a 2019 project in Richland, Michigan, a 2023 project in Lenox, Michigan, and a 2023 project in Santa Fe, New Mexico. (Resp. to Interrogs. 3–5.) However, there is no evidence that CMC performed work in Richland in 2019. The alleged Richland project was a siding installation for the Asch family residence (*see id.* at 5), but Johnston testified that the 2019 Asch project occurred in Grand Traverse County (8/27/2025 Johnston Dep. 13, ECF No. 48-6), which is far from Richland. In a subsequent interrogatory response, CMC asserted instead that the Asch project occurred in Richland. (Resp. to Interrogs. 5.) As GSH notes, "a party cannot create a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony."[6] *Aerel, SRL v. PCC Airfoils, LLC*, 448 F.3d 899, 906 (6th Cir. 2006). Thus, "[a] directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* at 908. Because CMC has provided no explanation for the contradiction, it is beyond dispute that the Asch project occurred in Grand Traverse County, and thus was in the vicinity of Traverse City.

[6] Though an interrogatory response is not technically an affidavit, this rule's rationale applies even more strongly to interrogatory responses. *See Thompson v. Bruister & Assocs.*, No. 3:07-00412, 2013 WL 1092218, at *5 (M.D. Tenn. Mar. 15, 2013).

As to the other projects outside of Traverse City, a single project each in North Carolina and New Mexico cannot establish continued use of the marks in those states or nationwide. Moreover, use of the marks in those states is largely irrelevant to CMC's rights in Michigan. CMC has only completed a single project in Michigan outside the Traverse City area in the past fifteen years—the 2023 project in Lenox.[7] But a solitary project does not establish trademark rights.[8] *See Cir. City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054–55 (6th Cir. 1999) ("A party establishes a common law right to a trademark only by demonstrating that its use of the mark was 'deliberate and continuous, not sporadic, casual or transitory.'" (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir. 1974))); *E. F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d 512, 518 (6th Cir. 1943) ("As recognized by the common law, a trade-mark is generally the growth of a considerable period of use rather than a sudden invention; and the exclusive right to it grows out of its use and not its mere adoption.").

Second, CMC has received four inquiries through its website from prospective customers in southern Michigan. However, there is no evidence that it did business with these customers. Indeed, as CMC itself acknowledges, these prospective customers—who were all interested in deck construction or repair—may have actually intended to contact GSH. (*See* Opp'n Br. 14 (noting that these customers may have "been confused as to what company they were communicating with").) The fact that these customers were trying to reach GSH does indicate that

---

[7] GSH argues that this project cannot establish trademark rights because it occurred after GSH began using the marks. But that fact is not necessarily decisive, because it is not clear that GSH was using the marks in the Lenox area in 2023—most of its business at that time was in southwest Michigan. And though the Lenox project could not have expanded CMC's trademark rights if it occurred after GSH's registration of the marks, it is unclear which happened first—registration of the first relevant marks occurred in October of 2023, and the Lenox project occurred at some point during 2023.

[8] CMC also includes on its list of projects a 2021 home inspection conducted in Sault St. Marie, Michigan. But CMC does not cite this project as evidence of the scope of its trademark rights or address GSH's argument that the inspection did not occur (*see* Br. in Supp. 11 n.4). Regardless, one additional project would not establish that CMC conducts business statewide.

the marks themselves are similar enough to create confusion. But the relevant question here is whether CMC's "market penetration" into southern Michigan "is significant enough to pose the real likelihood of confusion among the consumers in that area." *ACCU Pers.*, 846 F. Supp. at 1206 (quotation marks omitted) (quoting *Nat. Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1397 (3d Cir. 1985)). And the fact that four people searching for GSH have accidentally stumbled upon CMC's website does not establish that CMC has a significant presence in southern Michigan.

Third, CMC points to other evidence of actual confusion between the two companies, but none of it establishes that CMC has market penetration in southern Michigan. For instance, suppliers have occasionally mixed up the companies (*see* 1/14/2026 Johnston Dep. 91–94), but the potential confusion among suppliers is largely irrelevant given that obtaining supplies from a particular geographic area does not establish market presence, as suppliers are not customers. Similarly, the fact that some companies with which CMC works have mistaken GSH's trucks for CMC's (*see* Johnston Decl. ¶¶ 12–16, ECF No. 56-67) sheds no light on whether customers in southern Michigan are aware of CMC's brand. And the fact that a few customers for whom CMC performed work in Traverse City have told CMC that they saw GSH's advertising in southern Michigan (*see* Johnston Decl. ¶¶ 13, 18) does not establish CMC's market presence there.

Finally, CMC represents that it has "advertised its services in connection with the CMC 2018 Marks on CMC's website continuously since 2018, and the services were never limited to customers in the area immediately surrounding Traverse City." (Opp'n Br. 28.) But the mere existence of a website that is accessible in a given area does not establish market presence in that area. *See* 4 McCarthy on Trademarks and Unfair Competition § 26:30.50 ("Merely being the senior user of a mark on the internet does not thereby create an exclusive right to the mark for internet use in all territories of the United States (or the world)."); *Hanginout, Inc. v. Google, Inc.*,

54 F. Supp. 3d 1109, 1124 (S.D. Cal. 2014) ("[T]he Court does not agree with [the plaintiff] that marketing, advertising, and promoting an unregistered mark over the Internet is sufficient to find nationwide market penetration."); *Dudley v. Healthsource Chiropractic, Inc.*, 883 F. Supp. 2d 377, 394 (W.D.N.Y. 2012) ("If, as the Plaintiff suggests, a senior common law user could claim exclusive use on the internet, then it would undermine the benefits and security provided by federal registration."). Rather, "[m]arket penetration by internet use of a mark should be determined[] primarily by evidence as to the place where buyers actually purchased the goods and services advertised on the internet site." 4 McCarthy on Trademarks and Unfair Competition § 26:30.50. CMC's website cannot extend its trademark rights beyond the geographic area where it does business.

To be clear, contrary to GSH's assertions, the conclusion that CMC has trademark rights only in the Traverse City area does not entail that CMC's infringement claims must be dismissed. There is evidence that GSH conducted at least two marketing campaigns in Traverse City and does business there. (*See* Fortier Dep. 132, 134 (testifying that GSH is currently performing work in the Traverse City area, and in total has done around "fifty to a hundred" projects in that region); GSH Jobs List, PageID.467, 473–74 (listing at least four recent projects in the Traverse City area).) Although Jason Locke testified that GSH has not performed any work in Traverse City since at least 2023 (*see* J. Locke Dep. 127), this testimony creates a dispute of fact that cannot be resolved at summary judgment. Because GSH makes no additional argument against liability, the Court will not dismiss any of CMC's infringement counterclaims against GSH. However, as explained below, the Court will grant summary judgment to GSH on its claim for declaratory relief regarding the geographic scope of CMC's trademark rights.

**C. Declaratory Judgment**

GSH seeks summary judgment on its claims for declaratory relief. Specifically, GSH asks the Court to

> [d]eclar[e] that [GSH] can continue to use the Green Shield Mark in commerce in connection with the Green Shield Services—or alternatively—declar[e] that the [GSH] can continue to use the Green Shield Mark in connection with the Green Shield Services in commerce everywhere outside the fifty-mile radius of Traverse City, Michigan.

(Compl. ¶ 68(a), ECF No. 1.) As explained above, GSH is not entitled to a declaration that it may continue to use the Green Shield Mark everywhere, but it is entitled to a declaration that it may continue to use the mark outside the fifty-mile radius of Traverse City.

GSH also seeks several other declarations. It asks the Court to:

> [d]eclar[e] that [CMC] owns no valid or enforceable trademark rights in [CMC]'s Marks or "Green Shield" that existed prior to the date that [GSH] commenced use of the Green Shield Mark and Registration, and/or that [CMC] has failed to continuously use (or has otherwise abandoned use of) [CMC]'s Marks;
>
> . . . [d]eclar[e] that [GSH] has not infringed and is not infringing, either directly or indirectly, any valid and enforceable trademark rights of [CMC] under 15 U.S.C. § 1114(1) or 15 U.S.C. § 1125(a), and/or that [CMC]'s trademark infringement claims are barred by the doctrines of laches, acquiescence, waiver, or estoppel—or alternatively, declaring that [CMC][9] has suffered no damages on account of any alleged infringement; [and]
>
> . . . [d]eclar[e] that [GSH] has not engaged in and is not engaging in unfair competition in violation of 15 U.S.C. § 1125(a) and/or that [CMC]'s unfair competition claims are barred by the doctrines of laches, acquiescence, waiver, or estoppel—or alternatively, declaring that [CMC] has suffered no damages on account of any alleged unfair competition . . . .

(*Id.* ¶ 68(B)–(D).) As set out above, because GSH has not established that CMC lacks enforceable trademark rights regarding the marks in question, and because there is evidence that GSH has

[9] The complaint refers here to "Plaintiff" (i.e., GSH) not suffering any damages, but the Court presumes that this is a typographical error.

infringed CMC's trademarks in Traverse City, the Court will deny summary judgment regarding these requested declarations.

In sum, GSH is entitled to only a declaratory judgment that CMC's trademark rights in the disputed marks do not extend more than 50 miles beyond Traverse City. The Court's decision to grant declaratory relief is discretionary, and must be made in light of the *Grand Trunk* factors, *see Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). The Court looks to (1) whether a declaratory judgment would settle the parties' dispute, (2) whether a declaratory judgment would clarify the parties' legal relations, (3) whether the party seeking declaratory judgment has engaged in procedural fencing, (4) whether a declaratory judgment would cause friction with state courts, and (5) whether the party seeking declaratory judgment has a more effective alternative remedy. *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014). Here, the factors counsel in favor of entering a declaratory judgment. A declaration would settle the controversy and clarify the legal relations between the parties without creating friction with state courts. Further, there is no evidence of procedural fencing, and no better alternative remedy is apparent. Thus, a declaratory judgment is warranted.

**D. Personal Liability**

Even if CMC's infringement claims against GSH may proceed, the individual defendants—Lyons, Rought, Jason Locke, and Brandie Locke—argue that they cannot be held personally liable for the acts of GSH. As explained below, the Court agrees that none of the individual defendants are liable, and will dismiss all claims against them.

**1. Direct Infringement**

"[A] person who is a member or manager of a limited liability company is not ordinarily liable for the acts, debts, or obligations of the company." *Dawley v. Hall*, 902 N.W.2d 435, 438 (Mich. Ct. App. 2017) (quotation marks removed), *vacated on other grounds*, 905 N.W.2d 863

(Mich. 2018). However, "[i]t is well established that a corporate officer or agent is personally liable for torts committed by him even though he was acting for the benefit of the corporation." *A & M Recs., Inc. v. M.V.C. Distrib. Corp.*, 574 F.2d 312, 315 (6th Cir. 1978).[10] Thus, individual liability for trademark infringement attaches if the defendants "personally take part in infringing activities or specifically direct employees to do so." *Gen. Motors LLC v. Autel.US Inc.*, No. 14-14864, 2016 WL 1223357, at *6 (E.D. Mich. Mar. 29, 2016) (quoting 4 McCarthy on Trademarks and Unfair Competition § 25:24 (4th ed. 1996)). The defendants must also commit the infringement "actively and knowingly." *Id.* (quoting 3A Fletcher Cyc. Corp. § 1158).

CMC argues that the individual defendants were personally aware of GSH's infringing activities since at least March 1, 2023, when Johnston emailed GSH about the issue. But even if the individual defendants knew that their marks were similar to CMC's, they are not liable for infringement unless they caused GSH to use the marks in the territory where CMC had trademark rights. CMC argues that GSH conducted marketing campaigns and performed work in the Traverse City area, but CMC does not point to evidence establishing that any individual defendant was responsible for those acts. "[T]he individual liability standard under the Lanham Act does not ask whether the individual participated or engaged in some infringing act; instead, it asks whether [s]he actively participated as a moving force in the *decision* to engage in the infringing acts, or otherwise caused the infringement as a whole to occur." *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1161 (11th Cir. 2022) (cleaned up). There is no evidence regarding who was the moving force behind the decision to infringe CMC's trademarks, so no individual liability can be established.

[10] Although the Court cites authority throughout this discussion that refers to corporations, the same principals are applicable to limited liability companies. *See* 3A Fletcher Cyc. Corp. § 1137 (Sep. 2026).

### 2. Contributory Infringement

CMC also seeks to hold the individual defendants liable on a contributory infringement theory.[11] "Contributory infringement is a judicially created doctrine that derives from the common law of torts, under which liability may be imposed upon those who facilitate or encourage infringement." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 163 (4th Cir. 2012) (cleaned up). The Supreme Court set out the framework for contributory liability in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 (1982), holding that "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit."[12] *See also Coach, Inc. v. Goodfellow*, 717 F.3d 498, 503 (6th Cir. 2013) ("Although the Lanham Act refers only to direct trademark infringers, *Inwood* established that liability may also be imposed on those who facilitate the infringement."). However, there is some uncertainty in the case law when it comes to contributory liability claims against corporate officers.

As noted above, officers are usually liable only if they are a moving force behind the corporation's infringing acts. But the contributory liability standard established by *Inwood* and subsequent case law seems to set a lower bar, requiring only knowledge of or willful blindness to

---

[11] CMC's complaint against the individual defendants does not explicitly mention contributory liability, but CMC argues for contributory liability in its brief (Opp'n Br. 31), and the individual defendants do not object in their reply to the consideration of such a claim. Moreover, contributory liability is in some sense not an independent "claim" insofar as it derives from the same provision of the Lanham Act that provides a right of action for direct infringement. Thus, the Court will treat CMC's complaint as alleging a contributory liability claim. *Cf. Ravazzani v. C.K. Collection, Inc.*, No. 24 CIV. 9673, 2026 WL 2906918, at *6 n.6 (S.D.N.Y. Sep. 28, 2026) ("Because Defendant briefed the issue and does not show prejudice, the Court considers the merits of both Plaintiff's direct and contributory theories of liability, regardless of whether Plaintiff specifically pleaded contributory liability in his complaint.").

[12] "Although [*Inwood*] dealt with Section 32 of the Lanham Act"—which covers registered trademarks—"its formulation of contributory infringement has been extended to cases arising under Section 43(a)" like this one. *Transdermal Prods., Inc. v. Performance Cont. Packaging, Inc.*, 943 F. Supp. 551, 553 (E.D. Pa. 1996); *see also Red Rock Sourcing LLC v. JGX LLC*, No. 21 CIV. 1054, 2024 WL 1243325, at *29 (S.D.N.Y. Mar. 22, 2024); 3 McCarthy on Trademarks and Unfair Competition § 25:21.25.

the infringing acts of others combined with some form of support or facilitation. *See, e.g.*, *Goodfellow*, 717 F.3d at 505; *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 479 (7th Cir. 2007) ("At best, [the defendant]'s 'ostrich-like' business practices amount to willful blindness, which is sufficient to show he had the intent necessary to be a contributory infringer."); *Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 255 (2d Cir. 2021) (contributory liability exists where defendant "knew or had reason to know that a tenant, subtenant or other occupant of its premises was selling, offering for sale, or distributing products bearing counterfeits of [plaintiff's] trademarks"); *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1001 (9th Cir. 2023); *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992). So difficulty arises when the two standards overlap—that is, when one alleges that a corporate officer is contributorily liable for the infringing acts of a corporation. In that situation, some courts have still applied the higher moving force standard, *see Microsoft Corp. v. Suncrest Enter.*, No. C03-5424, 2006 WL 1329881, at *6–7 (N.D. Cal. May 16, 2006), or cited both the moving force standard and the contributory liability standard without acknowledging any discrepancy between the two, *see Luxottica Grp. v. Greenbriar Marketplace II, LLC*, 212 F. Supp. 3d 1375, 1378–80 (N.D. Ga. 2016); *Microsoft Corp. v. Ram Distrib., LLC*, 625 F. Supp. 2d 674, 684 (E.D. Wis. 2008).

There is good reason to think that the *Inwood* standard, rather than the moving force standard, applies to a claim for contributory infringement against a corporate officer for the infringing acts of the corporation. As one district court has explained, the moving force standard originated in patent case law, and was an interpretation of a statutory provision that prohibits "'active[] induce[ment]' of patent infringement"—which is distinct from a separate statutory provision that prohibits "contributory infringe[ment]." *Sapatis*, 27 F. Supp. 3d at 247 (alterations in original). Thus, the moving force standard is distinct from—and, it appears, higher than—the

standard for contributory infringement. Moreover, as the *Sapatis* court recognized, there is no reason to apply a higher contributory liability standard for corporate officers than for all other actors. *Id.* at 246. It is true that "a corporate officer will not be personally liable for 'the mere fact of being an officer or director of an infringing corporation.'" *Gen. Motors*, 2016 WL 1223357, at *6 (quoting 3A Fletcher Cyc. Corp. § 1158). But the existence of a corporation does not shield an officer who would otherwise be liable—"a corporate officer or agent is personally liable for torts committed by him even though he was acting for the benefit of the corporation." *A & M Recs.*, 574 F.2d at 315; *see also Sapatis*, 27 F. Supp. 3d at 245 ("[T]he corporate form [does not] automatically immunize[] corporate officers from personal liability for conduct undertaken on the corporation's behalf."). So if a defendant's actions would otherwise satisfy the contributory liability standard, their status as a corporate officer should not bar liability. *See Sapatis*, 27 F. Supp. 3d at 247–48 ("[T]here is no common law basis for imposing an alternative tort liability standard based solely on a defendant's status as an agent of an organization."); *Postman v. Spin Master, Ltd.*, No. CV 14-5516, 2015 WL 12747905, at *8 (C.D. Cal. Nov. 30, 2015) (citing *Sapatis* with approval).

Ultimately, resolving this issue is unnecessary because none of the individual defendants are liable under even the lower *Inwood* standard. *Inwood* itself contemplates only two scenarios where contributory liability may be imposed: "a manufacturer or distributor intentionally induces another to infringe a trademark, or . . . it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement." 456 U.S. at 854. There is no evidence here that the individual defendants intentionally induced GSH employees to commit infringement, so only the second scenario is at issue. Courts have expanded this scenario beyond manufacturers and suppliers to other contexts that present similar relationships between the actors. *AT&T v.*

*Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1432–33 (3d Cir. 1994) ("Of course, there is no reason why the doctrine should be confined in application to manufacturers, and indeed, other courts have expanded it beyond that particular origin.").

For example, the Sixth Circuit has held that a flea market operator may be contributorily liable for the infringing acts of vendors where the operator "knew or had reason to know of the infringing activities and yet continued to facilitate those activities by providing space and storage units." *Goodfellow*, 717 F.3d at 502–05. These facts parallel the situation contemplated by *Inwood* insofar as the flea market operator provides a resource to a third party—i.e., the space in which to operate—while knowing that the third party will use that resource to commit infringement. Similarly, the Eleventh Circuit has stated that "contributory trademark infringement might be grounded upon a franchisor's bad faith refusal to exercise a clear contractual power to halt the infringing activities of its franchisees." *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1522 (11th Cir. 1992). Again, liability exists because a franchisor supports the business ventures of the franchisee, and thus helps the franchisee accomplish its infringement.

In short, to establish contributory liability, CMC must show that the individual defendants' relationship to the employees who committed the allegedly infringing acts is analogous to a manufacturer's relationship to a reseller, a flea market operator's relationship to a vendor, or a franchisor's relationship to a franchisee. But there are simply no facts here to establish such a relationship. CMC does not provide any evidence regarding GSH's decision to do business in Traverse City from which one could infer that the individual defendants facilitated or contributed to that decision. The closest CMC comes is with respect to Rought, who appears to have known that GSH was doing work in Traverse City (*see* Rought Dep. 123) and, as CEO, presumably had the power to stop that business. But these facts still do not establish contributory liability; even if

Rought knew about the infringing activity and could have stopped it, his inaction does not constitute facilitation or contribution. A defendant's inaction can create liability when they are already providing a product or service to the infringer—a flea market operator who knowingly provides a venue for an infringing vendor has an obligation to stop doing so. But Rought was not providing any products or services to GSH employees that they used for their infringing activities, so he had no such obligation.

It is true that courts analyzing contributory infringement claims have focused on "the extent of control exercised by the defendant over the third party's means of infringement," *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 984 (9th Cir. 1999), and Rought presumably did have control over the employees' infringing acts in that he could have stopped them. But this type of control, in the abstract, is not sufficient to establish liability. Rather, control is an *additional* element that applies when the defendant is not a supplier of products to the infringer. That is, if the defendant "provided services rather than a product" to the third-party infringer, the plaintiff would "also need[] to establish that [the defendant] had direct control and monitoring of the instrumentality used by a third party to infringe [the plaintiff's] marks." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 942 (9th Cir. 2011) (cleaned up). Again, because Rought did not provide a product or service to the infringers, his ability to stop their infringement does not establish liability.[13]

CMC also argues that the individual defendants are vicariously liable for the infringing acts of GSH because they "had the right and ability to supervise the infringing activity and also had a direct financial interest in such activities." *Innovation Ventures, LLC v. Aspen Fitness Prods.*,

[13] Although courts applying the "moving force" standard also sometimes state that liability is incurred by an officer who "controls" the infringing activity, *see, e.g.*, *Edmondson*, 43 F.4th at 1161, in context this language refers to an officer who directly orders the activity to occur—not one who merely has the ability to stop it from happening.

Inc., No. 11-CV-13537, 2015 WL 11071470, at *16 (E.D. Mich. Mar. 31, 2015) (quotation marks omitted). This standard at most creates liability for Rought due to his position as CEO—there is no evidence that any other individual defendant had the ability to supervise the infringing activity. More importantly, this vicarious liability standard is a principle of copyright law that a few courts seem to have erroneously ported over to the trademark context. Under the Copyright Act, a person "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). But the Supreme Court has indicated that the standard for contributory infringement under trademark law is narrower than the standard for vicarious liability under copyright law. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19 (1984). Thus, it is inappropriate to extend the "financial interest" standard to the trademark context. *See Hard Rock Cafe*, 955 F.2d at 1150 (rejecting application of financial interest standard in trademark case); *see also* 152 A.L.R. Fed. 573 (1999) (noting that the financial interest standard does not apply to trademark infringement because "[t]he standards for proving secondary liability [for trademark infringement] require significantly greater involvement with the infringement by the alleged secondary infringer than is required under the copyright laws"). While some district courts have cited the financial interest standard in trademark cases, *see, e.g.*, *Innovation Ventures*, 2015 WL 11071470, at *16; *Days Inn Worldwide, Inc. v. Adrian Motel Co.*, No. 07-13523, 2009 WL 3199882, at *12 (E.D. Mich. Sept. 30, 2009), those cases are unpersuasive because they do not acknowledge the distinction between the secondary liability standards in copyright and trademark law. Thus, the Court declines to apply the financial interest standard here. *Accord Coach, Inc. v. Swap Shop, Inc.*, 916 F. Supp. 2d 1271, 1280 (S.D. Fla. 2012); *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 780 (N.D. Ill. 2008).

**3. State Law**

Though the case law discussed above concerns the Lanham Act, the Court reaches the same result with respect to CMC's state law claims. Generally, identical principles of corporate officer liability apply under Michigan law and federal law: "as Michigan courts have recognized, '[o]fficers of a corporation may be held individually liable when they personally cause their corporation to act unlawfully.'" *Dep't of Agric. v. Appletree Mktg., LLC*, 779 N.W.2d 237, 246–47 (Mich. 2010) (alteration in original) (quoting *Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 742 N.W.2d 140, 143 (Mich. Ct. App. 2007)). Because CMC has not provided evidence of the individual defendants' personal involvement in the infringing activities, it cannot hold them individually liable on its state law infringement claims.

As to a contributory liability claim under state law, the parties do not brief the issue of whether Michigan recognizes such a claim, and there appears to be no case law from Michigan courts on the issue. But contributory infringement originates in the common law, and "Michigan trademark infringement law is modeled after the federal scheme," *Nelson v. Millerknoll, Inc.*, No. 1:23-CV-464, 2025 WL 2848577, at *10 (W.D. Mich. Sept. 29, 2025) (footnote omitted), so the Court presumes that Michigan courts would also recognize a contributory liability claim. *See Reliable Carriers Inc. v. Moving Sites LLC*, 309 F. Supp. 3d 473, 478 (E.D. Mich. 2018) (allowing contributory infringement claim to proceed under federal and Michigan law); *cf. Georgia Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 449 (4th Cir. 2010) (holding that, where state and federal trademark law were similar, plaintiff's "unfair competition claim under [state] common law must be analyzed under the judicially created doctrine of contributory trademark infringement, derived from the common law of torts"); *Sapatis*, 994 F. Supp. 2d at 203 (noting that, where state trademark law aligned with federal law, there is "no reason why the [state] Supreme Court would not recognize the common law tort of contributory trademark infringement

in line with the *Inwood* standard."). However, because CMC has not established the individual defendants' liability under the Lanham Act, it has also not established their liability under state law.

**4. Piercing the Corporate Veil**

In the alternative, CMC resorts to a different argument for personal liability of the individual defendants: piercing of the corporate veil. The presumption that the corporate form will be respected, "often referred to as a 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to subvert justice or cause a result that is contrary to some overriding public policy." *EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 499 (6th Cir. 2021) (quoting *Seasword v. Hilti*, 537 N.W.2d 221, 224 (Mich. 1995)). "Piercing the corporate veil is an equitable remedy "sparingly invoked to cure certain injustices that would otherwise go unredressed." *Id.* (quoting *Gallagher v. Persha*, 891 N.W.2d 505, 509 (Mich. Ct. App. 2016)).

As an initial matter, it is not clear whether state or federal law should be applied in determining whether to pierce the corporate veil in connection with CMC's federal claims. "When considering piercing the corporate veil, a court usually applies the law of the state of incorporation of the allegedly offending entity." *S&S Innovations Corp. v. UUSI, LLC*, No. 1:18-cv-1377, 2021 WL 2070064, at *4 (W.D. Mich. May 24, 2021). However, "[w]here a veil-piercing case is brought under a federal statute, 'there is significant disagreement over whether courts should borrow state law, or instead apply a federal common law of veil piercing.'" *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 64 (D.D.C. 2011) (cleaned up) (quoting *United States v. Bestfoods*, 524 U.S. 51, 63 n.9 (1998)); *see, e.g.*, *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007) (observing that the Sixth Circuit has applied federal common law standard for corporate veil piercing in ERISA case). The general principle is that "[i]f the federal

statute in question demands national uniformity, federal common law provides the determinative rules of decision." *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 26 (1st Cir. 2000). The Sixth Circuit has never addressed the proper standard to apply to a Lanham Act claim. *See also* Stephen B. Presser, Piercing the Corp. Veil § 3:17 (Dec. 2025) ("Courts have reached little consensus as to the proper standard to apply to veil piercing claims arising under the Lanham Act.").

Because the federal and Michigan veil-piercing standards are similar, and because CMC has not satisfied either standard, it is unnecessary to determine which law controls. Under federal law, "[t]he corporate veil may be pierced . . . if the court finds substantial reasons for doing so after weighing the following factors: (1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators." *Mich. Carpenters Council Health & Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 384 (6th Cir. 1991) (quotation marks omitted). Similarly, "Michigan courts will . . . pierce the corporate veil [if] (1) the corporate entity was a mere instrumentality of another entity or individual;" (2) "the plaintiff suffered an unjust loss;" and (3) "the corporate entity was used to commit a fraud or wrong." *EPLET*, 984 F.3d at 499.

CMC argues that the corporate veil should be pierced because GSH has engaged in fraud. First, CMC contends that Rought, who was a certified home inspector when he founded GSH, intended to use the company for a "scheme" in which he would recommend GSH to homeowners whose houses he inspected. (Opp'n Br. 17.) Rought did testify that he planned to use home inspections "to get leads and appointments" for GSH. (Rought Dep. 28.) But aside from a vague

suggestion of wrongdoing, CMC does not explain why this arrangement would be fraudulent or illegal, so it is not a basis for piercing the corporate veil.

Next, CMC argues that the founders of GSH concealed the role of Jason Locke in the company because Locke has a prior felony conviction for the sale of unregistered securities. (*See* Plea Agreement, ECF No. 56-40.)[14] CMC claims that the founders of GSH wanted to avoid the public scrutiny that would come with having Locke attached to the company, and sought to pay Locke while avoiding garnishment due to his outstanding restitution obligations. But even if these accusations are true, veil-piercing is not warranted. CMC presents no evidence as to most of the veil-piercing factors; for example, there is no allegation that GSH's owners did not respect the distinction between their assets and GSH's assets. CMC also does not explain why piercing the veil is necessary to avoid injustice; for instance, there is no suggestion that GSH would be unable to satisfy a money judgment. Most significantly, the fraud that CMC alleges has no connection to the parties' trademark dispute. Even if GSH's founders concealed Locke's role in the company or improperly avoided garnishment, those acts are entirely unrelated to GSH's alleged trademark infringement, and did not contribute to or exacerbate that infringement in any way. Thus, piercing the corporate veil is not warranted.

In sum, the Court will grant summary judgment to the individual defendants on all claims.

## IV. CONCLUSION

For the reasons explained above, the Court will grant in part and deny in part the motion for summary judgment. It is beyond dispute that CMC lacks the right to use the disputed marks beyond a 50-mile radius surrounding Traverse City, so GSH is entitled to a declaratory judgment regarding its ability to operate outside that area. The individual defendants have also established

[14] Jason Locke's conviction is under his prior name, Jason Juberg.

beyond dispute that they are not liable for any infringing acts of GSH, so CMC's claims against them will be dismissed, and judgment will be entered in the member case docketed at 1:25-cv-854. The surviving claims are GSH's claims against CMC and CMC's counterclaims against GSH.

An order and judgment will enter in accordance with this Opinion.

Dated: November 25, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE